# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF MISSOURI

IN RE:                                      )
                                            )   Case No. 11-41669
PREMIER GOLF MISSOURI, LLC,                 )
                                            )
             Debtor                         )

## MEMORANDUM OPINION

Before this Court is the Objection to Chapter 11 Trustee's Motion to Sell Real and Personal Property Free and Clear of Liens, Interests and Encumbrances (the "Objection") filed by Martin P. Ostronic, Carla B. Ostronic, Double "O" Development, LLC, KAH Legacy Holding Company, LLC and M & G Contractors, LLC (collectively, the "Ostronic Group").[1]  The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §§1334(b), 157(a) and 157(b)(1).  This is a core proceeding which this Court may hear and determine and in which it may issue a final order pursuant to 28 U.S.C. §§157(b)(2)(A), (N) and (O).  What follows are the Court's Findings of Fact and Conclusions of Law as required by Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure.  For the reasons stated in this Opinion, the Court overrules the Objection.

### I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Premier Golf Missouri, LLC (the "Debtor") owns and operates an 18-hole golf course and clubhouse located in Clay County, Missouri, doing business as the Staley Farms Golf Club (the "Golf Club").  The Debtor's principal assets consist of the Golf Club, the real estate on which the Golf Club is located, and the revenues the Golf Club generates.

Ostronic is in the construction and development business.  Beginning in 2004, Ostronic was

---

[1] The Trustee's Motion to Sell Real and Personal Property Free and Clear of Liens, Interests and Encumbrances will hereinafter be referred to as the "Motion."  Martin P. Ostronic will hereinafter be referred to as "Ostronic."

responsible for building the Golf Club, modifying the golf course, and working with the general manager to assist with operations. To that end, he and the Ostronic Group purchased a number of items for use at the Golf Club (*e.g.*, furniture, fitness equipment, kitchen appliances), and invested a substantial amount of capital and operational funding. Besides being a principal of the Golf Club, Ostronic eventually took over the general manager function. In September, 2009, the Debtor commenced a chapter 11 bankruptcy case in this Court (the "First Bankruptcy"). That case was dismissed under §1112 for cause in February, 2010.

Between the First Bankruptcy and this one, Ostronic worked with the Golf Club's lender to reduce its debt and continued his efforts to manage the property. The Debtor filed its voluntary petition under chapter 11 on April 12, 2011. Shortly after the bankruptcy filing, the Court entered an order appointing the Trustee pursuant to §§1104 and 1108. The Trustee spent several months addressing the Debtor's cash flow needs and attempting to maintain the Golf Club for the benefit of the Debtor's members, vendors and employees. She ultimately concluded that the Debtor's current operations and financial affairs were below par, and the Debtor had no ability to reorganize or effectuate a plan of reorganization. Consequently, the Trustee filed the Motion on February 6, 2012. In addition to selling the real property (golf course and clubhouse), intellectual property, assignable rights and permits, the Trustee sought approval to sell the following assets:

> all machinery, equipment (including all office equipment), trade fixtures, tools, dies, motor vehicles and furniture (the "Equipment"), owned by Premier Golf Missouri, LLC and wherever located, including but not limited to all such items which are located in any building, warehouse, office or other space leased, owned, occupied or used in connection with the operation of the Debtor's business.

Motion p. 4, paragraph 18.b.

On February 7, 2012, the Ostronic Group filed its Objection to the Motion.[2] The Ostronic Group asserted that a significant amount of its personal property was still located at the Golf Club and should not be subject to the sale (the "Disputed Assets"). The Disputed Assets include such items as construction and kitchen equipment, office furniture, and decorative accessories.

The Court subsequently entered an order to tee up the sale, establishing the bidding procedures and setting a date for the auction. At a hearing held on March 1, 2012, the Trustee announced that the auction had been conducted pursuant to §363(f) and that Armed Forces Bank, N.A. (the "Bank") was the successful bidder. By Order dated March 8, 2012, this Court approved the sale of the Debtor's assets to the Bank subject to the Court's determination of what interest, if any, the Ostronic Group had in the Disputed Assets.

A hearing on the Objection was held on April 30, 2012. The parties subsequently submitted post-trial briefs on the issue of whether the Disputed Assets were property of the Debtor's estate. The Ostronic Group maintains that it acquired the Disputed Assets and none of the items it is claiming as its sole and separate property was ever sold or transferred to the Debtor. Moreover, the Ostronic Group contends that the documentary evidence overwhelmingly supports its position. The Bank asserts that the Ostronic Group failed to meet its burden to prove that it owns the Disputed Assets and that the weight of the evidence establishes the Debtor as the rightful owner.[3] For the

---

[2] The Ostronic Group also filed a Motion for Relief from Stay in which it restated the arguments made in the Objection.

[3] The Bank also argued that it has a valid and perfected security interest in the Disputed Assets under Mo. Rev. Stat. §9-203, and that the Trustee had the ability to sell the Disputed Assets pursuant to Bankruptcy Code §363(f). Because there is sufficient evidence to base its holding on the proof of ownership issue, it is not necessary for the Court to address these arguments.

reasons stated below, this Court is in agreement with the Bank.

## II. DISCUSSION

### A. Burden of Proof

The Ostronic Group asserted that the Trustee had the burden of proving that the Debtor owned the Disputed Assets, relying on *In re Usery*, 158 B.R. 470 (Bankr. W.D. Mo. 1993) and *State of Missouri v. Patchen*, 652 S.W.2d 265 (Mo. App. W.D. 1983). Both are inapplicable. The *Usery* case involved a turnover proceeding while the Patchen case involved a criminal forfeiture proceeding. The courts' determination regarding the burden of proof is limited to those contexts. Here, the Motion and Objection involve an asset sale and are governed by §363 of the Bankruptcy Code. The statute is dispositive of this issue. Section §363(p) dictates which party has the burden of proof and provides that "the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." Thus, the Ostronic Group bears the burden of proving its ownership interest in the Disputed Assets.

Property interests are created and defined by state law. *Butner v. United States*, 440 U.S. 48, 55 (1979). Under Missouri law, mere possession of personal property is insufficient to establish ownership, but *exclusive* possession and control is prima facie evidence of ownership. *Patchen*, 652 S.W.2d at 267. *See also Ross v. Pendergast*, 182 S.W.2d 307, 310 (Mo. 1944)("It is well settled law that exclusive possession and control over property are circumstances that raise a presumption of ownership...."). The Ostronic Group cited that very proposition in its own post-trial briefing and admits that the Disputed Assets were located at the Club. At the same time, the Ostronic Group maintains that although the Disputed Assets were "in the putative possession of the Debtor," Ostronic "exercised complete and unfettered control over all of the disputed property" in his

capacity as the "managing member of Premier Golf." The evidence does not bear that out.

Both the Debtor's former general manager and controller testified that the Debtor used the Disputed Assets (or at least some of them) on a regular basis – "If not daily, weekly, monthly in operations." The general manager also testified that the Ostronic Group did not attempt to control how the property was used and that the Debtor did not share possession with any other party. Since Ostronic and other members of the Ostronic Group were not in control of the Debtor's day-to-day operations, their claims of ownership and control are simply not credible. Ostronic merely "possessed" the Disputed Assets by virtue of his ownership interest in the Debtor. To find otherwise, the Court would have to pierce the corporate veil, a result not supported by the evidence. The Trustee established the Debtor's exclusive possession and control over the Disputed Assets. Thus, under Missouri law, the Trustee raised a presumption of ownership by the Debtor and the Ostronic Group bore the burden of rebutting that presumption.

### B. Proof of Ownership

Missouri law requires minimal evidence to establish ownership for non-titled property; any competent evidence may be used. *Renaissance Leasing, LLC v. Vermeer Manufacturing Co.*, 322 S.W.3d 112, 122 (Mo. 2010). For example, oral testimony from a witness with knowledge concerning ownership of the personal property constitutes competent evidence. *Hallmark v. Stillings*, 648 S.W.2d 230, 234 (Mo. App. 1983).

The Ostronic Group attempts to prove its ownership of the Disputed Assets primarily by establishing that it purchased the assets. To that end, the Ostronic Group offered into evidence several documents, among them:

– a list of personal property in which the Ostronic Group claimed an interest;[4]

– a "Vendor QuickReport" for Double O Development with supporting invoices for kitchen equipment and dining room furniture;

– a similar report with invoices covering miscellaneous decorative accessories;

– a compilation of invoices for furniture; and

– a Job Costs Detail for Double O Development with copies of checks attached.

The documents on which the Ostronic Group relies, however, miss the mark. In the first place, the list of Disputed Assets contains vague descriptions of the property the Ostronic Group claims, if any at all. As a result, many of the Ostronic Group's invoices do not correspond with the entries appearing on the list.[5] In addition, despite Ostronic's claim that he, personally, purchased the assets, most of the invoices were issued to the Debtor, not to Ostronic.[6] The upshot is that the Court is unable to conclude, without speculating, that all of the Disputed Assets were acquired and owned by the Ostronic Group based on the documentary evidence it submitted.

Even if the Court were to concede that the Disputed Assets were purchased by Ostronic or

---

[4] The Ostronic Group was directed by this Court to provide an itemized list to the Trustee and to the Bank. That list was cross-referenced with other written inventories prepared by the Debtor and a representative of the Bank. The result is the list of Disputed Assets to which this Court refers in this Opinion, an exhibit that was offered into evidence by the Trustee and admitted without objection.

[5] For example, the Court can only guess as to whether the invoice for the "Beverage Table, 84"L w/ sink on left" covers the "7' stainless steel prepping table with sink" appearing on the Ostronic Group's list. Further, many of the items on the furniture invoices do not seem to appear on the list. Conversely, many of the items appearing on the list do not seem to be validated by the invoices proffered by the Ostronic Group.

[6] Invoices for the kitchen supplies, for example, show that the items were sold to "Staley Farms Golf Club." Invoices for the decorative accessories indicate that the items were sold to "Staley Farms Golf Course and Marty Ostronic."

the Ostronic Group, acquisition is not determinative of ownership. The Ostronic Group placed the Disputed Assets in the Debtor's exclusive possession and control immediately after they were acquired. With one exception, the Ostronic Group executed no lease or other document governing the transfer or describing what the Ostronic Group expected of the Debtor with respect to the property, *e.g.,* a gift, a bailment, a loan or a lease.[7] The Ostronic Group claims that it did not intend to loan the Disputed Assets to the Debtor, asserting that it did not invoice the Debtor for them, nor did it book their costs as a loan. However, Ostronic testified at the hearing on the Objection that he "intended at some point to transfer to the club actual ownership [of the items purchased] and bill them for it...." This intent was reiterated in the Ostronic Group's post-trial briefing in which it stated that "the Ostronic Group paid for the construction and for the personal property with the view to later be paid for the construction and to sell and/or lease the personal property to Premier Golf." In contrast, Ostronic testified during cross-examination at the very same hearing that he "never expected to be repaid for those."[8] The lack of both conclusive documentation and consistent testimony creates an ambiguity as to the parties' intent, another indication that the Ostronic Group has not met its burden of proof.

Other evidence presented to the Court weighs in favor of the Debtor's ownership interest in the Disputed Assets. The Debtor's general manager testified that the Debtor was responsible for the maintenance and repairs of the Disputed Assets. He and the Trustee also testified that the Debtor maintained personal property insurance covering them. The significance of these factors in the

---

[7] A lease agreement did exist between Double "O" Development and the Golf Club to rent 74 golf carts.

[8] Ostronic testified yet another time, on re-direct examination, that he intended to transfer actual ownership of the assets to the Golf Club "at some point" and "bill them for it."

Court's analysis is illustrated in the *Renaissance Leasing* case. The dispute in *Renaissance* involved the ownership of art, antiques and jewelry. The plaintiff, the debtor's mother, sought the turnover of the property she claimed belonged to her. The trustee countered that the plaintiff intended to make gifts of the property to her daughter (the debtor). To support his position, the trustee presented the following evidence: 1) the plaintiff left all the property in the exclusive control of the debtor, 2) the debtor stored the jewelry in a safety deposit box to which only the debtor had access, 3) the debtor paid all expenses for insurance, storage, maintenance and repair, 4) the debtor indicated on financial statements issued to banks that she was the owner of the disputed property, and 5) the actions of both the debtor and the plaintiff were consistent with treating the items as if they belonged to the debtor. Although the plaintiff testified that she continued to own the property, the facts as stated above were contrary to her testimony. The court rejected the plaintiff's position and held that the items were property of the estate. The trustee had established a prima facie case that the plaintiff intended to give the items to the debtor as gifts many years before the bankruptcy filing, and the plaintiff offered no credible evidence in rebuttal. Here, as noted previously, the uncontroverted evidence showed that the Debtor maintained exclusive possession, use and control of the Disputed Assets, paid for their insurance coverage, and took responsibility for their maintenance and repair. These factors are resolved in favor of the Trustee.

Ostronic's prior testimony, another factor for the Court's consideration, is replete with inconsistencies. Inconsistent testimony carries significant weight in the court's determination of competing ownership interests. *See, e.g.*, *In re Prosser*, 2012 WL 246279 (Bankr. D. Virgin Islands 2012). The trustee in the recent case of *Prosser* filed a notice to auction off some of debtor's personal property. The debtor and his wife objected, arguing that the sale property was held

by them as tenants by the entireties under state law. This required a showing of "unity of interest," *i.e.*, that the owners held identical interests in the property. The following evidence was presented: the debtor failed to list any of the sale property as entireties property on his original schedules; the debtor failed to list the property in his amended schedules, even though he amended them a total of five different times; the debtor testified before the court, under oath, that he had no ownership interest whatsoever in the property and that his wife held a 100% interest. The court stated that "the Prossers cannot now, for their own convenience, change their testimony and claim that their intent was to hold this property as tenants by the entireties." *Id.* at *2. The *Prosser* court held that the state entireties law did not apply because the debtor's failure to make that designation in his schedules was "further evidence that he never intended to hold the Sale Property as tenants by the entireties." *Id.* at *3.

Here, the Ostronic Group takes the position, on the one hand, that the Debtor never owned the Disputed Assets. On the other hand, Schedule B of the Debtor's Bankruptcy Schedules filed in the First Bankruptcy, and *signed by Ostronic under penalty of perjury*, shows several items of personal property owned by the Debtor such as "Kitchen Equipment" valued at $75,000 and "Office equipment & FF&E" valued at $39,903. When questioned at the hearing on the Objection as to why the equipment was listed on the bankruptcy schedules in the First Bankruptcy, Ostronic testified as follows: "I guess some of that equipment by the controller was inadvertently put on the bankruptcy schedule." The Statement of Financial Affairs filed in that case, also signed by Ostronic, indicates in response to Question 14 that the Debtor does not hold or control any property owned by another person. When questioned at the hearing about his change of position, Ostronic testified that although he was involved in preparing the documents for the First Bankruptcy, he was "uninformed

about the equipment being utilized," and that the list of property held for another "[wasn't] complete" and had "some errors." Ostronic shifted blame to the controller who assisted in preparing the documents and to his bankruptcy counsel, asserting that his signature on the petition and schedules in both bankruptcy cases was "contingent upon the advice of [my] counsel." The Court finds Ostronic's explanations unsatisfactory. As "Authorized Agent" and representative of the Debtor, Ostronic had first-hand knowledge of all the matters to which he attested as well as access to the Debtor's books and records necessary to complete the bankruptcy filing. Ostronic signed the bankruptcy papers under penalty of perjury. It was his responsibility to review the information contained in those documents to insure that his attestation was accurate. Ostronic had numerous opportunities to amend the documents filed in the First Bankruptcy to reflect his ownership interest in the Disputed Assets, but failed to do so.

Ostronic testified under oath at the hearing to dismiss the First Bankruptcy that "Double O doesn't have any assets. There's nothing in Double O." At a deposition by the Bank held in October, 2011, Ostronic testified under oath that Double O Development didn't own any property other than "[s]ome small pieces of equipment." Like the debtor in *Prosser*, Ostronic cannot swing from one position to another and expect his testimony to be accepted by this Court as credible.

The Ostronic Group's attempt to show that the Disputed Assets were not listed in the Schedules filed in the current bankruptcy case as owned by the Debtor failed as well. The general manager, the representative who signed the Schedules on behalf of the Debtor, testified that several of the Disputed Assets were indeed included in Schedule B as the Debtor's personal property: office equipment, furniture, fixtures, maintenance equipment, tables and chairs, and clubhouse equipment. The Ostronic Group did not meet its burden to prove otherwise. Furthermore, the only items listed

in response to Question 14 in the Statement of Financial Affairs as property held for Double O Development are pieces of construction equipment, trucks and trailers. Ostronic testified at the hearing on the Objection that he prepared the list along with the Debtor's former controller. He also admitted that it was incomplete and contained errors – some of the items had been returned to him. Ostronic was asked why those items were not included in the First Bankruptcy's Statement of Financial Affairs and he replied: "At the time, I wasn't instructed by my counsel....And at the time, essentially all my assets from my perception were gone outside of Double O, not realizing that items that I may have purchased that the club was using or my personal items that I owned that were being utilized, but were still actual assets of mine, but were mainly used by the club."  As stated previously, placing blame on bankruptcy counsel is not a valid excuse for Ostronic's failure to provide accurate information or to amend the bankruptcy papers to reflect the assets The Ostronic Group now claims it owns.

The Ostronic Group's inconsistency is also apparent when reviewing what it did *not* say or do. Both the Debtor's general manager and the Trustee testified that the Ostronic Group never made a demand on the Debtor for payment and did not attempt to take possession of the Disputed Assets until it filed the Objection. Ostronic admitted that, but offered the following explanation at the hearing on the Objection:

> [O]nce we filed the bankruptcy, it was my intent that it was a reorganization, Chapter 11, and that we'd reorganize, successfully reorganize the club, and I'd continue the operation of the club. The last thing I wanted to do was hamper the club's operation by removing stuff out of a facility that I planned to continue to own and operate.

Ostronic's explanation is implausible. The Trustee was appointed in this case shortly after the petition date and was able to conclude soon thereafter that the Debtor was unable to reorganize.

That was apparent in light of the state of the Debtor's operations and the debt it was carrying. Given Ostronic's involvement in the Golf Club and his access to the books and records, it is reasonable to infer that he was aware that the likelihood of the Debtor reorganizing was slight, and that he would have demanded the property that allegedly belonged to him.[9]

Additionally, the Ostronic Group did not produce tax returns or any financial statements for Double "O" Development or Ostronic, personally, as evidence of its ownership interest in at least some of the Disputed Assets. The appearance of the construction equipment and the kitchen equipment, for example, on the depreciation schedules would have bolstered the Ostronic Group's case for ownership. Instead, Ostronic testified that the Debtor's former controller "expensed it" as a construction cost – they were never shown as fixed assets of the Ostronic Group. Based on the controller's testimony at the hearing on the Objection, the Court has doubts as to whether that accounting method was proper or even reasonable.

Admittedly, the Trustee's claim to the Disputed Assets is not without holes. One would expect, as the Ostronic Group pointed out, that the Disputed Assets would appear on the depreciation schedules to the Debtor's tax returns. They do not. For the years 2007, 2008 and 2009, the only Disputed Assets that arguably appear on the depreciation schedules are the pieces of computer equipment, maintenance equipment and software. That is not fatal, however. No outcome would be entirely consistent with every piece of evidence in this case. The Court has reached its conclusion in favor of the Trustee based on the record taken as a whole, considering all indicia of ownership and the competency of the evidence presented.

---

[9]The general manager testified that he walked through the Golf Club with Ostronic in May, 2010, and the only property Ostronic claimed that he owned personally was a large wall painting.

## IV. CONCLUSION

The Ostronic Group has failed to satisfy its burden of proof. Under Missouri law, the Trustee made a prima facie case that the Debtor owned and controlled the Disputed Assets at the time of the bankruptcy filing and the Ostronic Group offered nothing to rebut the presumption other than inconclusive documents and inconsistent testimony. The Debtor possessed, maintained, repaired and insured them, essentially exercising all the incidents of ownership. The Court is unable to conclude that the Disputed Assets were acquired and controlled by the Ostronic Group. Based on the entire record, therefore, the Court overrules the Objection and finds that the Disputed Assets were owned by the Debtor. Accordingly, the Disputed Assets shall be deemed sold to the Bank as of the entry date of the Order approving the sale. In addition, the Ostronic Group's Motion for Relief from Stay is hereby denied.

Dated: July _6__, 2012         ___/s/ Dennis R. Dow_____
                               THE HONORABLE DENNIS R. DOW